UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

PAUL DISANO                          :
                                     :
        v.                           :          C.A. No. 13-707ML
                                     :
CAROLYN COLVIN                       :
Commissioner of the Social Security  :
Administration                       :


## REPORT AND RECOMMENDATION

Lincoln D. Almond, United States Magistrate Judge


This matter is before the Court for judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Social Security Disability Insurance ("SSDI") and Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"), 42 U.S.C. § 405(g). Plaintiff filed his Complaint on October 23, 2013 seeking to reverse the decision of the Commissioner. On May 30, 2014, Plaintiff filed a Motion to Reverse the Decision of the Commissioner. (Document No. 10). On July 29, 2014, the Commissioner filed a Motion for Order Affirming the Decision of the Commissioner. (Document No. 12). Plaintiff filed a Reply Brief on August 15, 2014. (Document No. 13).

This matter has been referred to me for preliminary review, findings and recommended disposition. 28 U.S.C. § 636(b)(1)(B); LR Cv 72. Based upon my review of the record, the parties' submissions and independent research, I find that there is substantial evidence in this record to support the Commissioner's decision and findings that Plaintiff is not disabled within the meaning of the Act. Consequently, I recommend that the Commissioner's Motion for Order Affirming the

Decision of the Commissioner (Document No. 12) be GRANTED and that Plaintiff's Motion to Reverse the Decision of the Commissioner (Document No. 10) be DENIED.

## I.      PROCEDURAL HISTORY

Plaintiff filed applications for SSDI on February 11, 2011 (Tr. 194-204) and DIB on January 26, 2011 (Tr. 202-203) alleging disability since May 26, 2010.[1]  (Tr. 159-169).  The applications were denied initially on January 25, 2011 (Tr. 123-125) and on reconsideration on July 14, 2011. (Tr. 126-132).  Plaintiff requested an Administrative hearing.  (Tr. 132).  On July 5, 2012, a hearing was held before Administrative Law Judge Donald P. Cole (the "ALJ") at which time Plaintiff, represented by counsel and a vocational expert ("VE") appeared and testified.  (Tr. 38-78).  The ALJ issued an unfavorable decision to Plaintiff on July 11, 2012.  (Tr. 19-37).  The Appeals Council denied Plaintiff's Request for Review on August 21, 2013, therefore the ALJ's decision became final.  (Tr. 7-10).  A timely appeal was then filed with this Court.

## II.      THE PARTIES' POSITIONS

Plaintiff argues that the ALJ erred by failing (1) to find that he meets Listing 12.05(C) (intellectual disability); (2) to properly apply the treating physician rule; and (3) to properly evaluate his credibility.

The Commissioner disputes Plaintiff's claims and asserts that his IQ test results do not meet the requirements of Listing 12.05(C), and that the ALJ properly evaluated the medical evidence and Plaintiff's credibility.

---

[1]  At the July 5, 2012 hearing, Plaintiff amended his onset date from April 10, 2010 to May 26, 2010 which is the date when Plaintiff suffered a stroke and stopped working as a stockroom employee at Walmart.  (Tr. 42).

### III.    THE STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  Ortiz v. Sec'y of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

Where the Commissioner's decision is supported by substantial evidence, the court must affirm, even if the court would have reached a contrary result as finder of fact.  Rodriguez Pagan v. Sec'y of Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987); Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).  The court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  Frustaglia v. Sec'y of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

The court must reverse the ALJ's decision on plenary review, however, if the ALJ applies incorrect law, or if the ALJ fails to provide the court with sufficient reasoning to determine that he or she properly applied the law.  Nguyen v. Chater, 172 F.3d  31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).  Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled.  Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) citing, Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985).

The court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405(g); under sentence six of 42 U.S.C. § 405(g); or under both sentences. Seavey, 276 F.3d at 8. To remand under sentence four, the court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. Id.; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow her to explain the basis for her decision. Freeman v. Barnhart, 274 F.3d 606, 609-610 (1st Cir. 2001). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council). After a sentence four remand, the court enters a final and appealable judgment immediately, and thus loses jurisdiction. Freeman, 274 F.3d at 610.

In contrast, sentence six of 42 U.S.C. § 405(g) provides:

> The court...may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405(g). To remand under sentence six, the claimant must establish: (1) that there is new, non-cumulative evidence; (2) that the evidence is material, relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause

for failure to submit the evidence at the administrative level. See Jackson v. Chater, 99 F.3d 1086, 1090-1092 (11th Cir. 1996).

A sentence six remand may be warranted, even in the absence of an error by the Commissioner, if new, material evidence becomes available to the claimant. Id. With a sentence six remand, the parties must return to the court after remand to file modified findings of fact. Id. The court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings. Id.

## IV.    THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

### A.    Treating Physicians

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of a claimant's impairments, is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported

by objective medical evidence or is wholly conclusory.  See Keating v. Sec'y of Health and Human Servs., 848 F.2d 271, 275-276 (1st Cir. 1988).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986).  When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion.  20 C.F.R § 404.1527(c).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  See 20 C.F.R. § 404.1527(c)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527(e).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (see 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the province of the Commissioner.  20 C.F.R. § 404.1527(e).  See also Dudley v. Sec'y of Health and Human Servs., 816 F.2d 792, 794 (1st Cir. 1987).

**B.      Developing the Record**

The ALJ has a duty to fully and fairly develop the record.    Heggarty v. Sullivan, 947 F.2d 990, 997 (1st Cir. 1991).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right if counsel is not retained.  See 42 U.S.C. § 406; Evangelista v. Sec'y of Health and Human Servs., 826 F.2d 136, 142 (1st Cir. 1987).  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  Id.  However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  See Heggarty, 947 F.2d at 997, citing Currier v. Sec'y of Health Educ. and Welfare, 612 F.2d 594, 598 (1st Cir. 1980).

**C.      Medical Tests and Examinations**

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; see also Conley v. Bowen, 781 F.2d 143, 146 (8th Cir. 1986).   In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  Carrillo Marin v. Sec'y of Health and Human Servs., 758 F.2d 14, 17 (1st Cir. 1985).

**D.      The Five-step Evaluation**

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, she is not

disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. § 404.1520(f). Significantly, the claimant bears the burden of proof at steps one through four, but the Commissioner bears the burden at step five. Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003) (five-step process applies to both SSDI and SSI claims).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423(d)(2)(B). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant bears the ultimate burden of proving the existence of a disability as defined by the Social Security Act. Seavey, 276 F.3d at 5. The claimant must prove disability on or before the last day of her insured status for the purposes of disability benefits. Deblois v. Sec'y of Health and Human Servs., 686 F.2d 76 (1st Cir. 1982), 42 U.S.C. §§ 416(i)(3), 423(a), (c). If a claimant

becomes disabled after she has lost insured status, her claim for disability benefits must be denied despite her disability.  Id.

### E.     Other Work

Once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  Seavey, 276 F.3d at 5.  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant.  Allen v. Sullivan, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines (the "grids").  Seavey, 276 F.3d at 5.  Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  Id.; see also Heckler v. Campbell, 461 U.S. 458, 103 S. Ct. 1952, 76 L.Ed.2d 66 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills.  Nguyen, 172 F.3d at 36.  In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert.  Heggarty, 947 F.2d at 996.  It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.  See Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a specific finding as to whether the non-

exertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations.

### 1.    Pain

"Pain can constitute a significant non-exertional impairment."  Nguyen, 172 F.3d at 36. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged.  42 U.S.C. § 423(d)(5)(A).  The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1528.  In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the First Circuit's six-part pain analysis and consider the following factors:

> (1)    The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
>
> (2)    Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);
>
> (3)    Type, dosage, effectiveness, and adverse side-effects of any pain medication;
>
> (4)    Treatment, other than medication, for relief of pain;
>
> (5)    Functional restrictions; and
>
> (6)    The claimant's daily activities.

Avery v. Sec'y of Health and Human Servs., 797 F.2d 19, 29 (1st Cir. 1986). An individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423(d)(5)(A).

### 2. Credibility

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. Rohrberg, 26 F. Supp. 2d at 309. A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. See Frustaglia, 829 F.2d at 195. The failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. See DaRosa v. Sec'y of Health and Human Servs., 803 F.2d 24 (1st Cir. 1986).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

## V. APPLICATION AND ANALYSIS

Plaintiff was forty-nine years old on the date of the ALJ's decision. (Tr. 46). Plaintiff has a seventh grade education. Id. Plaintiff's past relevant work was as a warehouse and store laborer. (Tr. 69). Plaintiff alleges disability due to a heart attack, a stroke, back pain and depression. (Tr. 42). Plaintiff remains insured for purposes of DIB through December 31, 2015. (Tr. 24).

On May 26, 2010, Plaintiff was seen at Rhode Island Hospital for sudden onset of right arm weakness with facial weakness and difficulty in speaking. (Tr. 296). An EKG and an echocardiogram showed that he had apparently had a heart attack about two months previously. Id. He was then started on heparin drip therapy. Id. At the time of admission, he acknowledged smoking a pack of cigarettes and drinking seven to eight alcoholic beverages per day. Id. MRI findings confirmed the diagnosis that Plaintiff suffered a stroke. (Tr. 297). His heart dysfunction was thought likely due to alcohol use, with coronary artery disease as a differential diagnosis. Id. He was counseled to stop both his smoking and his alcohol consumption. Id. He was discharged after two days, in stable and improved condition. (Tr. 298).

In June 2010, Plaintiff was seen by a cardiologist, Dr. Gilson, who noted that Plaintiff still smoked about two packs of cigarettes a day and drank seven to eight alcoholic beverages a day. (Tr. 308-309). He had remained active after his discharge from the hospital, but experienced fatigue. (Tr. 308). Plaintiff had not returned to work. Id. Dr. Gilson felt that Plaintiff had made a good recovery from his myocardial infarction and his subsequent stroke, but that continued upper extremity discomfort was "concerning." (Tr. 310). Dr. Gilson also counseled Plaintiff about his need to stop smoking. Id.

In July 2010, Plaintiff was seen by Dr. McKendall for a cardiac catheterization consult. (Tr. 303). At this time, Plaintiff told Dr. McKendall that he was smoking more than before his stroke, was still having seven to eight drinks a day and was not being compliant with his prescribed medication regimen. Id. He experienced dyspnea on exertion (such as climbing stairs) and left arm pain if he engaged in a greater level of exertion. Id. Findings on mental status examination were normal. Id. On neurological examination, Plaintiff showed mild right arm weakness. Id. A chest

x-ray in August showed possible mild emphysema but no cardiac abnormalities. (Tr. 302). Cardiac catheterization performed on August 13, 2010 showed single vessel disease involving the left descending anterior artery, with a rich collateral network. (Tr. 304-305). After reviewing the catheterization results, Dr. McKendall concluded that Plaintiff was best suited for continued medical therapy and aggressive risk modification. (Tr. 311).

In July 2010, Dr. Paolella, Plaintiff's general practitioner, filled out a temporary disability insurance form indicating that Plaintiff would not be able to work for ten weeks. (Tr. 329). The doctor filled out a similar form the following month (Tr. 339) and in October 2010. (Tr. 366-367).

In August 2010, Plaintiff told Dr. Gilson that he was feeling increasingly anxious and consequently had been smoking up to four packs of cigarettes per day. (Tr. 312). He also complained of constant fatigue and exertional calf pain. Id. Findings on examination were normal, other than Plaintiff's slightly anxious appearance. Id. Dr. Gilson concluded that Plaintiff's moderate left ventricular systolic dysfunction was well-compensated and that his current complaints were largely non-cardiac in nature. (Tr. 313). Dr. Gilson felt Plaintiff had extreme anxiety and possible sleep apnea. Id. Calf tightness was not due to claudication. Id. He encouraged Plaintiff to walk on a daily basis and reiterated the need for Plaintiff to stop smoking. Id. Dr. Gilson considered Plaintiff unable to do any work that involved heavy physical labor due to his cardiac situation. Id. In October, Dr. Gilson wrote a letter stating that Plaintiff was not able to perform "physical work" for the foreseeable future. (Tr. 314).

In September 2010, Plaintiff was taken to Rhode Island Hospital by the police when he was found sleeping on the sidewalk. (Tr. 448). The next morning, Plaintiff claimed he had consumed one beer and taken hydrocodone and Valium tablets because he was feeling stressed. Id. Plaintiff

acknowledged using drugs and alcohol, and denied suicidal thoughts.  Id.  He appeared calm and cooperative.  Id.  He reported that he was in no pain and denied dizziness and headaches.  (Tr. 449). He did not recall much about the events of the preceding night.  Id.  A cerebral CT scan showed no acute pathology, but only mild, generalized atrophic changes.  (Tr. 451).

In November 2010, Plaintiff underwent a consultative psychological evaluation conducted by Dr. Fontaine, a psychologist.  (Tr. 315).  Plaintiff told Dr. Fontaine that he currently experiences numbness in his left hand and toes, had balance problems, trouble holding things and was forgetful. (Tr. 316).  Plaintiff reported a history of temper difficulties and interpersonal problems since his early years.  Id.  He had a history of cocaine and alcohol abuse; he acknowledged drinking currently, but tended to downplay it.  Id.  He was upset about his recent break-up with his girlfriend, which he blamed on his physician.  Id.  Plaintiff was currently staying in his mother's apartment, along with his twenty-two year old daughter.  Id.  He was not receiving any psychological treatment, but his general practitioner prescribed medications for anxiety and depression.  (Tr. 316-317).  Plaintiff was vague in his answers as to his current drinking, but his mother indicated that he did have a drinking problem.  (Tr. 317).  He reported sleeping difficulties and vague suicidal thoughts.  Id.  WAIS-IV testing showed a full scale sum score of 64 and full scale composite score of 75 (indicative of performance at the fifth percentile level).  (Tr. 318).  Achievement testing showed a third-grade reading level and fifth-grade arithmetic level.  (Tr. 319).  The Beck Depression Inventory suggested moderate depression.  Id.  Plaintiff generally had no trouble with focusing and attending, or following directions, but lost focus if tasks became overly academic in nature.  Id.  Dr. Fontaine felt testing showed that Plaintiff was functioning within the borderline range of intelligence generally, with an IQ in the range between 72 and 87.  (Tr. 319-320).  He felt that Plaintiff likely had a learning

disability in reading and writing. <u>Id.</u> Dr. Fontaine felt that Plaintiff had the ability to handle work involving short, simple instructions, but would have moderate difficulty with work involving detailed instructions. (Tr. 321). Plaintiff reportedly tended to get agitated easily, and so might have trouble following rules and regulations and adjusting to demands of the work setting when agitated. <u>Id.</u>

In February 2011, Dr. Gilson noted that Plaintiff complained of intermittent disorientation, forgetfulness, migratory weakness, clumsiness, hand and foot numbness, exertional dyspnea, musculoskeletal chest pains and blood in his urine. (Tr. 324). Findings on examination were essentially normal. <u>Id.</u> Testing showed hyperlipidemia. <u>Id.</u> Dr. Gilson did not believe any of Plaintiff's reported symptoms were clearly referable to his cardiac condition and was not sure that further neurological evaluation would be fruitful. (Tr. 325). He emphasized to Plaintiff once again the importance of exercise and smoking cessation. <u>Id.</u> That month, Dr. Gilson filled out a form indicating that he did not think Plaintiff could perform even sedentary work on a full-time basis. (Tr. 382-387).

In April 2011, Plaintiff was taken to Rhode Island Hospital in a state of intoxication after threatening to assault his sister. (Tr. 452). Initially Plaintiff was in a euphoric mood, but later he claimed he was suicidal and was placed under restraint. (Tr. 452-454). When seen by Dr. Tija, Plaintiff acknowledged using alcohol and cocaine (both snorting it and smoking it) on and off since the 1980s. (Tr. 466). He was discharged to return home after his condition stabilized. (Tr. 455). Alcohol dependence and cocaine abuse were diagnosed. <u>Id.</u>

In August 2011, Dr. Gilson noted that Plaintiff's cardiac condition was stable but he complained of depression, confusion and memory loss. (Tr. 378). In September, Dr. Gilson wrote

a letter indicating that Plaintiff was disabled from performing any sort of "meaningful work" due to shortness of breath due to mild heart failure, and residuals of his stroke (disorientation, forgetfulness, weakness, clumsiness, depression and anxiety). (Tr. 376). Also in September, Dr. Moonan, an internist and anatomic pathologist, wrote a letter indicating Plaintiff was not able to do "heavy physical labor" due to his cardiac condition. (Tr. 381).

In October 2011, Plaintiff was seen at Rhode Island Hospital, following a motor vehicle collision. (Tr. 483). On admission, he smelled of alcohol and admitted having used alcohol. (Tr. 484). His primary complaint was scalp pain and he was noted to have multiple abrasions and small lacerations on his body and the back of his head. Id. CT scanning showed non-displaced fractures of the right L3 and L4 transverse processes. (Tr. 493). His discharge note advised him that he would feel increased soreness for a few days and then should begin to feel better. (Tr. 482). He was directed to use ibuprofen and percocet as needed for pain relief and warned not to drive if using percocet. Id.

In December 2011, Plaintiff was seen at Rhode Island Hospital for complaints of chest pain and suicidal ideation and visual hallucinations. (Tr. 396). An echocardiogram showed no significant change from 2010. (Tr. 427). A stress test showed a large scar in the left anterior descending artery, with a small degree of peri-infarct ischemia. Id. The Psychiatric Department evaluated his condition and found no need for inpatient treatment. (Tr. 428). Plaintiff was discharged after three days in improved condition, with instructions to follow up with primary care, to have a social work consultation and to apply to the prescription assistance program. Id.

In February 2012, Dr. Gilson noted that Plaintiff was currently living with his brother, who was also not working. (Tr. 418). Plaintiff could barely afford his medications. Id. He said that he

-16-

had occasional chest discomfort but no progressive symptoms.  Id.  On examination, he appeared a little disheveled and anxious.  Id.  Dr. Gilson noted that Plaintiff's chest pain was atypical and he did not think Plaintiff was having ongoing symptoms of myocardial ischemia.  (Tr. 419).  Plaintiff's blood pressure was elevated.  Id.

In June 2012, Dr. Gilson filled out a form stating he was not able to separate out Plaintiff's drug and alcohol use from his disability.  (Tr. 504).  He acknowledged that Plaintiff's current disabilities might be exacerbated by drug and alcohol use.  (Tr. 505).  He felt that residual neurological deficits were due to the Plaintiff's heart attack and subsequent stroke but also noted that he was not a neurologist.  (Tr. 505).

In December 2010, Dr. Slavit, a state agency psychologist who reviewed Plaintiff's records, concluded that he should be able to handle work involving short, simple instructions; maintain attention and concentration for two hours at a time, over the course of a full workday; and interact with others so long as the interactions are brief and superficial.  (Tr. 88-89).

In January 2011, Dr. Cochran, a state agency reviewing physician, concluded that Plaintiff should be able to do light work that did not involve concentrated exposure to respiratory irritants, moderate exposure to extremes of temperature and humidity or any exposure to hazardous working conditions.  (Tr. 86-88).

In June 2011, Dr. Nanian, a state agency reviewing physician, largely concurred with Dr. Cochran's opinion from January 2011, but concluded that Plaintiff should not stand or walk for more than two hours in a workday.  (Tr. 100-101).  In June 2011, Dr. Litchman, a state agency reviewing psychologist, rendered an assessment that was largely the same as that of Dr. Slavit.  (Tr. 102-103).

**A.     The ALJ's Decision**

The ALJ decided this case adverse to Plaintiff at Step 5.  At Step 2, the ALJ found that Plaintiff's cardiomyopathy, high cholesterol, borderline intellectual functioning/learning disorder and depression were "severe" impairments within the meaning of 20 C.F.R. §§ 404.1520(c) and 416.920(c).  (Tr. 24).  The ALJ did not, however, find that any of these impairments, either singly or in combination, met or medically equaled any of the Listings.  (Tr. 26).  The ALJ determined that Plaintiff retained the RFC to perform a limited range of sedentary work including nonexertional limitations related to his borderline intellect.  (Tr. 27).  Although the ALJ found at Step 4 that Plaintiff was physically unable to perform his past relevant work as a laborer, he determined at Step 5 that Plaintiff was capable of performing certain unskilled sedentary positions such as assembler and packager.  (Tr. 35-36).  Thus, he concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. 36).

**B.     The ALJ Did Not Err By Failing to Consider Listing 12.05(C) at Step 3.**

Plaintiff argues that the ALJ erred by not finding at Step 3 that he is per se disabled under Listing 12.05(C).  Listing 12.05 (intellectual disability[2]) "refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22."  As to the required level of severity to meet Subsection C of Listing 12.05, it requires a "valid  verbal, performance or a full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."

---

[2] The Listing was recently amended to change the name of the category from mental retardation to intellectual disability but the substantive requirements to meet the Listing have not changed.

At Step 3, the claimant bears the burden of proving that his impairment(s) meet or equal one of the Listed impairments. See Wells v. Barnhart, 267 F. Supp. 2d 138, 144 (D. Mass. 2003). Here, Plaintiff does not identify any medical source who diagnosed him with an intellectual disability meeting Listing 12.05. In fact, although he was ably represented by counsel, Plaintiff never contended during the administrative proceedings that he had an intellectual disability meeting Listing 12.05. In his application, he identified heart attack and stroke as his disabling conditions. (Tr. 195). At the ALJ hearing, Plaintiff's attorney argued that his client was "disabled due to a cerebral artery stroke, left ventricular dysfunction, back pain caused by degeneration and back fractures and severe depression." (Tr. 42). He also argued that Plaintiff was functionally illiterate and thus per se disabled under Section 201.17 of the Grids. Id. He did not argue to the ALJ that Plaintiff met Listing 12.05 or that Dr. Fontaine's findings supported such a conclusion. Thus, it is not surprising that the ALJ instead focused on Listings 4.00 (cardiovascular system), 12.02 (organic mental disorders), and 12.04 (affective disorders) at Step 3. (Tr. 26-27).

Plaintiff relies primarily on Dr. Fontaine's consultative report. However, Dr. Fontaine expressly concludes that "[b]ased upon his cognitive abilities, at the 90% Confidence Interval [Plaintiff's] IQ ranged between 72 and 87." (Tr. 319). He also opined that Plaintiff fell within the "borderline range of intelligence" and had a learning disability in reading and writing and functioned between the third- and fourth-grade level in those areas. (Tr. 319-320). As to functional limitations, Dr. Fontaine opined that Plaintiff has "basic cognitive abilities in order to understand and remember work locations and short, simple instructions" with "moderate difficulties understanding and remember[ing] detailed instructions" and "carrying out detailed and complex instructions." (Tr.

321). Finally, he diagnosed "borderline intelligence" at Axis II and not intellectual disability or mental retardation. (Tr. 320).

Dr. Fontaine did not interpret Plaintiff's IQ scores as Plaintiff advocates in this appeal. Dr. Fontaine concluded that Plaintiff's "IQ ranged between 72 and 87" which does not meet Listing 12.05(C). (Tr. 319). Dr. Fontaine's report was also considered by Dr. Slavit (Tr. 88-90) and Dr. Litchman (Tr. 98-99, 101-103) and neither of them interpreted the report or test results to meet Listing 12.05(C). Rather, they completed an RFC assessment and affirmed Dr. Fontaine's diagnosis of borderline intellectual functioning (Tr. 85, 98). The ALJ concluded that their opinions were "not unreasonable" and entitled to "considerable weight in light of the...intact mental status exams." (Tr. 31). While Plaintiff disagrees with the conclusions reached by Dr. Fontaine, Dr. Slavit and Dr. Litchman, he has shown no error in the ALJ's evaluation of such medical evidence and, more significantly, Plaintiff fails to identify any contrary medical evidence which would have met his Step 3 burden of proving that he met Listing 12.05. See Rivera-Torres v. Sec'y of HHS, 837 F.2d 4, 5 (1st Cir. 1988) (the resolution of evidentiary conflicts is within the province of the ALJ).

**(C)      The ALJ Properly Evaluated the Conflicting Medical Evidence of Record**

In his RFC finding that Plaintiff could physically do a limited range of sedentary work, the ALJ relied on the opinions of the reviewing physicians Dr. Cochran and Dr. Nanian, as well as the opinion of Dr. Moonan,[2] one of Plaintiff's treating physicians. (Tr. 27, supported at Tr. 86-88, 100-101, 380-381). In finding that Plaintiff could do work involving simple, routine, repetitive tasks (which required no more than a fourth grade reading/writing level), with no interaction with the

---

[2] Dr. Moonan restricted Plaintiff from doing "heavy physical labor" and the ALJ reasonably interpreted that opinion to mean that he felt Plaintiff was able to perform less demanding work. (Tr. 35, 381). The ALJ also accurately noted that this interpretation was consistent with RFC assessments of Dr. Cochran and Dr. Nanian. (Tr. 35).

general public and only occasional brief, work-related interactions with coworkers and supervisors, the ALJ relied on the opinions of the reviewing psychologists, Dr. Slavit and Dr. Litchman and the examining report of Dr. Fontaine. (Tr. 27, supported at Tr. 88-89, 102-103, 315-321). Under the applicable regulations, the expert opinions of such medical experts may amount to substantial evidence where they represent a reasonable reading of the entirety of the relevant medical evidence. 20 C.F.R. §§ 404.1527(e) and 416.927(e). Even in cases where there are contrary opinions by treating sources, the ALJ may nonetheless assign greater weight to the opinion of a reviewing physician, so long as the ALJ articulates an adequate and supported basis for doing so. Arroyo v. Sec'y of HHS, 932 F.2d 82, 89 (1st Cir. 1991).

Plaintiff argues that the ALJ here erred by not accepting the disabling limitations proposed by his treating cardiologist, Dr. Gilson. (Tr. 382-387). Plaintiff argues that Dr. Gilson's opinion was well supported by medically acceptable test results and clinical findings and not inconsistent with other evidence in the record. (Document No. 10-2 at p. 15). Thus, he argues that the ALJ was required to give it controlling weight.

Under the applicable regulations, the opinion of a treating physician on the ultimate legal issue of disability is not entitled to any special significance. 20 C.F.R. §§ 404.1527(d) and 416.927(d). In addition, the medical opinions of treating doctors are only entitled to controlling weight when they are medically well-supported and not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(c) and 416.927(c).

Here, the ALJ gave limited weight to Dr. Gilson's opinions, because they were unsupported by the record as a whole and not entirely consistent (Tr. 34); See Castro v. Barnhart, 198 F. Supp. 2d 47, 54 (D. Mass. 2002) (citing Shaw v. Sec'y of HHS, 25 F.3d 1037 (1st Cir. 1994)) ("[An ALJ]

may reject a treating physician's opinion as controlling if it is inconsistent with other substantial evidence in the record, even if that evidence consists of reports from non-treating doctors."). As the ALJ correctly noted, in August 2010, Dr. Gilson ruled out only "heavy physical labor" (Tr. 313) and, in October 2010, he again ruled out only "physical labor" (Tr. 314). Dr. Gilson also indicated that Plaintiff's reported symptoms were largely not due to cardiac causes. (Tr. 325, 419). The ALJ accurately noted that Dr. Gilson found Plaintiff to be "stable from a cardiac standpoint" on February 24, 2012. (Tr. 419). While Dr. Gilson thought that Plaintiff's limitations might be residuals of his stroke, he did not treat Plaintiff for neurological issues and acknowledged that he is not a neurologist. (Tr. 505). In addition, Dr. Gilson had previously indicated in 2010 that Plaintiff had made a good recovery from a neurologic as well as cardiac standpoint. (Tr. 310). In February 2011, he indicated that he was unclear if further neurological assessment of Plaintiff's condition would be fruitful. (Tr. 325). Plaintiff points to no evidence documenting a significant, sustained deterioration in his condition (other than the temporary ones relating to episodes of acute alcohol and/or substance abuse) during the course of 2011, which would justify Dr. Gilson's far more negative assessment of Plaintiff's capacity for work activities in 2012 than in 2010. In fact, in August 2011, Dr Gilson noted that Plaintiff had not had any neurological symptoms, palpitations, lightheadedness, chest discomfort or dyspnea. (Tr. 377). Finally, as the ALJ accurately noted, Dr. Moonan, who was also a treating source, ruled out only heavy physical labor on September 29, 2011 (Tr. 35) and nothing in Dr. Moonan's notes suggested that Plaintiff would not be able to do unskilled sedentary work. (Tr. 380-381).

While reasonable minds could differ as to the interpretation of this evidence, the issue presented in this administrative appeal is not whether this Court would have reached the same

conclusion as did the ALJ. "The ALJ's resolution of evidentiary conflicts must be upheld if supported by substantial evidence, even if contrary results might have been tenable also." Benetti v. Barnhart, 193 Fed. Appx. 6, 2006 WL 2555972 (1st Cir. Sept. 6, 2006) (per curiam) (citing Rodriguez Pagan v. Sec'y of HHS, 819 F.2d 1 (1st Cir. 1987)). Rather, the narrow issue presented is whether the ALJ's findings have adequate support in the record. Since they do in this case, there is no basis upon which to reject such findings. The ALJ thoroughly weighed the evidence in the context of the record as a whole and adequately explained his reasoning. Plaintiff has simply not shown the existence of reversible error in the ALJ's treatment of the medical evidence.

Plaintiff also argues that the opinions of the various medical reviewers should not have been given significant weight because of subsequent medical evidence. He also speculates that there is no indication that Dr. Nanian reviewed any more evidence in June 2011 than the initial reviewer did in January 2011. Id. In fact, the explanation of the reconsideration determination details the new and additional evidence considered by Dr. Nanian. (Tr. 94-95). Moreover, Plaintiff has not identified evidence of a sustained (and material) worsening in his condition after Dr. Nanian considered the medical evidence of record. Thus, the ALJ was justified in continuing to rely on such opinion. Abubakar v. Astrue, No. 11-10456, 2012 WL 957623, *11-12 (D. Mass. Mar. 21, 2012) (citing Ferland v. Astrue, No. 11-123, 2011 WL 5199989, *4 (D.N.H. Oct. 31, 2011)). Although Dr. Gilson placed much more severe limitations on Plaintiff in his February 2012 assessment, there is no evidence of any significant worsening in Plaintiff's condition after mid-2011. Plaintiff has

shown no error in the ALJ's evaluation of the medical evidence or any violation of the treating physician rule.[3]

##### VI.    CONCLUSION

For the reasons discussed herein, I recommend that the Commissioner's Motion for Order Affirming the Decision of the Commissioner (Document No. 12) be GRANTED and that Plaintiff's Motion to Reverse the Decision of the Commissioner (Document No. 10) be DENIED.  Further, I recommend that Final Judgment enter in favor of Defendant.

Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen (14) days of its receipt.  See Fed. R. Civ. P. 72(b); LR Cv 72.

---

[3] Plaintiff also contends that the ALJ failed to properly evaluate his credibility.  This argument merits little discussion.  The ALJ found that Plaintiff's overall credibility was called into question by his evasiveness at the hearing which is fully supported by a review of the hearing transcript.  Most significant is the following exchange which the ALJ accurately described as "patently unbelievable" given Plaintiff's claims of illiteracy.  (Tr. 32).

| | |
|---|---|
| Q: | Well, to get your driver's license you had to, among other things, take a written test. |
| A: | Right. |
| Q: | So you were able to take that written test? |
| A: | I would just memorize it. |
| Q: | What do you mean? |
| A: | In other words, my daughter read it to me and gave me all the answers. |
| Q: | Well, my understanding is when you take a test the questions aren't always the same each time. |
| A: | I know that. |
| Q: | So then how were you able to memorize it? |
| A: | I just did. |

(Tr. 49).

Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision.  See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


  /s/ Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
October 14, 2014